UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SHARAD JILES,

        Petitioner,

   -vs-

MICHAEL KIRKPATRICK,
Superintendent of the Elmira Correctional
Facility,

        Respondent.

_____

No. 6:20-cv-06111-CJS
DECISION AND ORDER

## APPEARANCES

For Petitioner:         Donald M. Thompson, Esq.
               Easton Thompson Kasperek Shiffrin LLP
               The Powers Building
               16 West Main Street, Suite 243
               Rochester, New York 14614

               Michael Confusione, Esq.
               Hegge & Confusione, LLC
               P.O. Box 366
               Mullica Hill, New Jersey 08062-0366

For Respondent:        Assistant Deputy Solicitor General Andrew
               W. Amend
               Assistant Attorney General Matthew Keller
               Attorney General of State of New York
               28 Liberty Street
               New York, New York 10005

## INTRODUCTION

   Sharad Jiles ("Jiles"), represented by counsel, seeks a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. *See* ECF No. 1. Jiles is in Respondent's custody pursuant

to a judgment entered against him on December 6, 2012, in New York State, Monroe

County Court (Piampiano, J.), following a jury verdict convicting him of two counts each of: second-degree murder (intentional and felony), first-degree robbery, third-degree robbery, and second-degree criminal possession of a weapon. Jiles asserts that he is entitled to habeas relief because: (1) the warrantless disclosure of his phone's historical cell site location information ("CSLI") violated the Fourth Amendment's proscription against unreasonable searches and seizures, (2) he was denied his right to equal protection under the Fourteenth Amendment in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), due to the prosecutor's use of peremptory strikes against two prospective jurors in a racially discriminatory manner, and (3) he was denied his Sixth Amendment right to the effective assistance of trial counsel. For the reasons below, the request for a writ of a habeas corpus is denied, and the petition is dismissed.

## BACKGROUND

### I.    The Crime and Pre-Trial Proceedings

The convictions at issue stem from a robbery that occurred on October 1, 2011, at an apartment rented by Jermaine Vasquez ("Vasquez") and located at 24 Peckham Street in the City of Rochester. Three men forced their way into the apartment, restrained Vasquez and his three guests (Joshua Tibbs ("Tibbs"), Dale Smith ("Smith"), and Richard Navedo ("Navedo")), and stole their cash and cell phones. Their friend, Sheldon Hepburn ("Hepburn"), unaware a robbery was in progress, entered the apartment. While struggling with one of the robbers, Hepburn was shot four times. He managed to run down the street to a convenience store where he collapsed. He died later that evening from his injuries.

2

A few days later, Vasquez told Rochester Police Department Officer Thomas Donovan ("Donovan") that a man named "Hot Rod" was one of the three men who robbed him and his friends at Peckham Street.  Vasquez said that earlier that day, Hot Rod had stopped by 24 Peckham.  After Hot Rod left, Vasquez received a call from him.  The incoming phone number was (585) 957-8336.

Based on the information provided by Vasquez to Donovan, the prosecution applied for a court order pursuant to the Stored Communications Act, 18 U.S.C. § 2703 ("SCA"), requiring wireless carrier T-Mobile to disclose the records for phone number (585) 957-8336 ("8336 phone").  *See* SR: 182-87.[1]  Monroe County Court Judge James Piampiano ("trial court") granted the application, finding that the records were "relevant and material," 18 U.S.C. § 2703(d), to an ongoing criminal investigation.  SR: 180-81.

Trial counsel filed a motion to suppress the cell phone records and the CSLI contained in them, arguing that they were obtained in violation of the Fourth Amendment. SR: 115-19.  Following oral argument on August 16, 2012, the trial court denied the suppression motion.  *See* SR: 201-05 (oral ruling); SR: 206-10 (written decision).

## II.    The Trial[2]

On October 1, 2011, Tibbs went to 24 Peckham Street in Rochester to give his friend Smith a haircut.  TT: 463-64.  When Tibbs arrived, he found Smith watching football

---

[1] Citations to "SR: " refer to the Bates-stamped numbers at the bottom of the state court records filed electronically by Respondent at ECF Nos. 12-2 (SR: 1-750), 12-3 (SR: 751-805), 12-4 (SR: 806-884), and 12-5 (SR: 885-900).  Citations to "TT:" and "ST:" refer to pages of the trial transcript and sentencing transcript, respectively.

[2] In light of the jury's guilty verdict, the Court summarizes the proof in the light most favorable to the prosecution, drawing all reasonable inferences in its favor.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979) ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.") (emphasis omitted).

with Vasquez, and Vasquez's cousin, Navedo.  TT: 463-64, 525, 535, 636-37.  Hepburn had been there earlier but left before Tibbs arrived.  TT: 514, 536-37, 637.

At some point that day, Jiles had stopped by the apartment, talked with Vasquez for about ten or fifteen minutes, and left.  TT: 643-44; *see also* TT: 467, 537-40.  Shortly before Jiles had stopped by, he had called Vasquez from the 8336 phone.  TT: 646-48.[3]

That evening, while Tibbs was cutting Smith's hair in the kitchen, Jiles called Vasquez again from outside the house and asked him who was there and what they were doing.  TT: 648.  Vasquez told Jiles to come in and then heard a knock at the door.  TT: 648-49; *see also* TT: 468, 543.[4]

When Vasquez answered the door, Jiles pushed the door open and entered the apartment, followed by two other men wearing face coverings.  TT: 469-70, 543-45, 598, 633-34, 650.  All three were carrying handguns.  TT: 469-70, 544-45, 650-51.  Jiles said to Vasquez, "[Y]ou know what time it is," which Vasquez understood to mean that they were being robbed.  Vasquez and his guests were restrained with duct tape.  TT: 471-73, 546-50, 651-52.  Tibbs could hear the intruders ransacking the apartment.  TT: 473-74.

A few minutes later, there was another knock at the door and Hepburn entered the apartment.  TT: 474-75, 551-52, 653-54.  Tibbs heard Hepburn say, "You trying to rob my people, my man," and then he heard sounds of a struggle near the front door.  TT: 475.  Vasquez, who was the closest to the front door, heard Hepburn say, "I am not going to

---

[3] Call detail records admitted in evidence as People's Exhibit 95 indicated that Vasquez's phone (585-284-8411) had received a call from the 8336 phone at 2:30 p.m.  TT: 685; *see also* SR: 133.

[4] Jiles's phone records which showed a 55-second call to Vasquez's phone at 9:29 p.m., followed several minutes later by three more calls to Vasquez's phone—a 7-second call at 9:37:50 p.m., a 26-second call at 9:38:02 p.m., and an 18-second call at 9:38:33.  *See* SR: 135.  The CSLI records admitted in evidence as People's Exhibits 93 and 97 showed that the 8336 phone was located in the general area of Peckham Street at this time.  TT: 916-17, 957-61, 1247-50.

let you tie me up, you are not about to tie me up, no, no."  TT: 654, 554.  Though the duct tape partially obscured his vision, Tibbs could see two men fighting over a gun.  TT: 475.

During the struggle, Vasquez heard Jiles say to the other two intruders, "[D]on't shoot them yet."  TT: 658.  Vasquez and Smith then heard two gunshots.  TT: 555, 654-56.  Tibbs heard two gunshots followed by three more shots a few seconds later.  TT: 476-77.  After that, they heard Jiles and his cohorts leave the apartment through the front door.  TT: 477, 555, 659.

After Vasquez removed the tape from his eyes, he found Navedo lying on the floor in the living room.  TT: 659-60.  Then, Vasquez, Navedo, and Smith ran downstairs to the basement and went to another apartment in the same house.  TT: 556-58, 663.  Tibbs left through the front door.  TT: 478-80, 663.

Hepburn had already left the apartment and was able to reach a convenience store around the corner on Hudson Avenue, where he collapsed on the floor in front of Mara Guzman ("Guzman"), the store's proprietor.  TT: 429-32.  Guzman called 911 and administered CPR to Hepburn.  TT: 433-34.  At first, Hepburn was talking and breathing but he soon became "really pale."  *Id.*  Despite the paramedics' efforts, Hepburn succumbed to his injuries.  He had been shot twice in his back, once in his chest, and once in his hip.  TT: 993-95, 997-98, 1023.

Jiles subsequently was interviewed by members of the Rochester Police Department.  He acknowledged that he knew who Vasquez and Hepburn were but denied having any dealings with either of them.  He also denied any role in the murder.  TT: 1041-44.

The defense did not call witnesses or present evidence.

5

The two robbery counts relating to Navedo were dismissed prior to jury deliberations after the prosecution conceded there was no evidence that Navedo had been robbed of any property.  TT: 1144-46.

On November 2, 2012, the jury returned a verdict convicting Jiles on the remaining charges in the indictment—two counts of second-degree murder (intentional and felony murder), two counts of first-degree robbery, two counts of third-degree robbery, and two counts of second-degree weapons possession.  TT: 1375-77.

On December 6, 2012, the trial court adjudicated Jiles a second felony offender and sentenced him to concurrent, indeterminate sentences of 25 years to life in prison on each of the murder convictions, to be served concurrently with the lesser sentences imposed on the other convictions.  ST: 21-24.[5]

## III.   Post-Judgment Proceedings in State Court

Represented by new counsel, Jiles appealed his conviction to the Appellate Division, of New York State Supreme Court ("Appellate Division").  Jiles asserted that reversal was warranted because, among other reasons, the trial court erroneously denied his motion to suppress his phone's CSLI, *see* SR: 43-62; and the trial court erroneously denied his *Batson* challenges, *see* SR: 12-17, 26-42.  On December 22, 2017, the Appellate Division unanimously affirmed the conviction.  *People v. Jiles*, 158 A.D.3d 75 (4th Dep't 2017).  The New York Court of Appeals denied leave to appeal on July 26, 2018.  *People v. Jiles*, 31 N.Y.3d 1149 (2018).

While Jiles's leave application was pending before the Court of Appeals, he filed a *pro se* motion pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 in

---

[5] Citations to "ST:" refer to pages of the sentencing transcript.

Monroe County Court.  SR: 281-329.  He asserted that (1) the prosecution violated *Brady* by withholding Vasquez's cell phone records and CSLI, *see* SR: 297-307; (2) the prosecutor committed misconduct by eliciting testimony that Smith knew Jiles by the nickname "Hot Rod" and referred to Jiles by that name during summation, *see* SR: 308-19; and (3) trial counsel was ineffective for failing to obtain the alleged *Brady* material or to object to the prosecutor's summation comments, *see* SR: 320-28.  The Monroe County Court (Ciaccio, J.) ("the 440 court") denied the motion without a hearing on September 20,2018.  SR: 863-68.  Jiles sought leave to appeal, SR: 869-92, which was denied by the Appellate Division, SR: 900.

## V.    Federal Habeas Proceeding

In his timely-filed, counseled habeas petition, ECF No. 1, Jiles reasserts the *Batson* and Fourth Amendment claims raised on direct appeal and the ineffective assistance of trial counsel claims asserted in the C.P.L. § 440.10 motion.  Respondent filed a response, ECF No. 12; the state court records and trial transcripts, ECF Nos. 12-1 through 12-6, and a memorandum of law in opposition, ECF No. 13.  Jiles filed a reply. ECF No. 14.

## DISCUSSION

## I.    Fourth Amendment

### A.    Background

Jiles reasserts the Fourth Amendment claim that he raised on direct appeal—that the CSLI records for his cell phone should have been suppressed because they were obtained without a warrant in violation of the Fourth Amendment.  The Appellate Division concluded that the prosecution's acquisition of that information was not a search requiring

a warrant because Jiles's use of his cell phone "constituted a voluntary disclosure of his general location to his service provider, and a person does not have a reasonable expectation of privacy in information voluntarily disclosed to third parties."  *Jiles*, 158 A.D.3d at 79-80 (citing, *inter alia*, *United States v. Carpenter*, 819 F.3d 880, 888 (6th Cir. 2016) (holding that the defendant lacked a reasonable expectation of privacy in the historical CSLI collected by the FBI because he had shared that information with his wireless carriers), *rev'd by Carpenter v. United States*, 138 S. Ct. 2206 (2018)).

The Appellate Division further held that any error in the trial court's refusal to suppress the CSLI was harmless because the evidence of Jiles's "identity as a participant in the crime [was] overwhelming, and there is no reasonable possibility that the verdict would have been different if the location information had been suppressed."  *Id.* at 81. The Appellate Division noted that two of the robbery victims were well acquainted with Jiles and identified him at trial.  *Id.*  Additionally, their testimony was corroborated by the portions of the phone records that Jiles did not seek to suppress, which established that he repeatedly called Vasquez on the date of the incident.  *Id.*

On June 22, 2018, while Jiles's leave application was pending before the New York Court of Appeals, the Supreme Court issued *Carpenter*, 138 S. Ct. 2206, which reversed the Sixth Circuit's decision on which the Appellate Division had relied.  The Supreme Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI," 138 S. Ct. at 2217, and that the "voluntary disclosure" rationale behind the third-party doctrine did not extend to the collection of CSLI.  *Id.* at 2219-20.  The Supreme Court found that the government's warrantless acquisition of about four months of Carpenter's historical CSLI was a "search"

within the meaning of the Fourth Amendment, *id.* at 2220, and that there were no exceptions that would have allowed the disclosure without the government first obtaining a warrant based on probable cause.  *Id.* at 2221.

Jiles supplemented his leave application to the New York Court of Appeals with argument based on *Carpenter*.  SR: 276-77.  The prosecution responded that *Carpenter* would not alter the result because the Appellate Division found that any Fourth Amendment error was harmless.  SR: 278-79.  The Court of Appeals denied leave to appeal.  SR: 280.

### B.    The Bar on Habeas Review of Fourth Amendment Violations

Respondent contends that the Fourth Amendment claim is barred because Jiles had a full and fair opportunity to litigate the claim in state court.  ECF No. 13 at 34 (citing *Stone v. Powell*, 428 U.S. 465 (1976)).  In *Stone*, the Supreme Court held that "where the State has provided *an opportunity for full and fair litigation* of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Id.* at 481-82 (emphasis supplied).  *Stone* thus requires only that the state provide a petitioner with the "opportunity" to litigate a Fourth Amendment claim. *McPhail v. Warden, Attica Corr. Fac.,* 707 F.2d 67, 69-70 (2d Cir. 1983).

The Second Circuit has recognized only two possible exceptions to *Stone*'s bar— the state provided "no corrective procedures at all" for review of alleged Fourth Amendment violations, or the petitioner was "precluded from using" the corrective procedures "because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992).  An "unconscionable breakdown" will

not be found absent some sort of "egregious" "disruption or obstruction of a state proceeding." *Id.*

Jiles fully availed himself of New York's statutory corrective procedures by filing a suppression motion in the trial court, appealing the denial of suppression to the Appellate Division, and requesting that the New York Court of Appeals grant leave to consider his Fourth Amendment claim in light of the then-newly-decided *Carpenter* decision. By statute, New York State provides corrective procedures that have been recognized as "facially adequate" for litigating Fourth Amendment claims. *Id.* n.1 (collecting cases). As a general matter, "[w]hen the state provides a facially adequate procedure, a petitioner cannot gain review of a Fourth Amendment claim simply by arguing that the federal court would have reached a different result." *Shaw v. Scully*, 654 F. Supp. 859, 863 (S.D.N.Y. 1987) (citing *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977) (*en banc*)).

Jiles contends that he did not have a full and fair opportunity to litigate his Fourth Amendment claim because the state courts did not recognize controlling Supreme Court caselaw. Jiles relies on an out-of-circuit district court decision for the proposition that a "'full and fair opportunity' also contemplates at least a recognition, and a reasonable application, of the correct Fourth Amendment standards." *Lee Vang Lor v. United States*, No. 07-CR-102-J, 2012 WL 13122770, at *4 (D. Wyo. Feb. 3, 2012) (citing *Gamble v. State of Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978)), *aff'd*, 706 F.3d 1252 (10th Cir. 2013). Jiles reasons that because the New York Court of Appeals refused to recognize and properly apply *Carpenter*'s holding, he did not have a full and fair opportunity to litigate his Fourth Amendment claim.

The language on which Jiles relies originated in *Gamble*, where the Tenth Circuit permitted federal review of a Fourth Amendment claim because "the state court willfully refuse[d] to apply the correct and controlling constitutional standards."  583 F.2d at 1165. "However, *Gamble* is not binding on this Court and its holding actually differs from the rule adopted in th[e] [Second] Circuit—namely that state courts must only 'provide an opportunity for full and fair litigation of a fourth amendment claim.'"  *Armstrong v. Duncan*, No. 03 CIV. 1442 (LBS), 2003 WL 22339490, at *5 (S.D.N.Y. Oct. 14, 2003) (quoting *Capellan*, 975 F.2d at 71).  *Capellan* explicitly held that "a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process."  975 F.2d at 72.  Here, Jiles simply argues that the state courts' multiple decisions on his suppression issue were wrongly decided.  "As in *Stone* itself, all [the Court] ha[s] is a claim of error—and that is not enough to support collateral relief based on the exclusionary rule."  *Hampton*, 296 F.3d at 565; *see also Capellan*, 975 F.2d at 72.

Jiles also asserts that he did not have a full and fair opportunity to litigate his Fourth Amendment claim because "the state court refused to correct a decision apply[ing] federal law that is completely contrary to a holding by the United States Supreme Court[, i.e., *Carpenter*,] that applied to the defendant's case under review."  ECF No. 14 at 2; *see also id.* at 4.  Therefore, Jiles concludes that he has met one of the preconditions for habeas relief, *see* 28 U.S.C. § 2254(d)(1).[6]

---

[6] "Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may not grant habeas relief to a state prisoner with respect to any claim that has been 'adjudicated on the merits in State court proceedings' unless the state-court adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Greene v. Fisher*, 565 U.S. 34, 35-36 (2011) (quoting 28 U.S.C. § 2254(d)(1)).

Jiles's specific argument regarding 28 U.S.C. § 2254(d)(1) implies that AEDPA abrogated the *Stone* doctrine and broadened the availability of habeas relief for Fourth Amendment claims.  He cites no precedent for the proposition AEDPA essentially trumps *Stone*'s bar on habeas review of Fourth Amendment claims.  In fact, the circuit courts of appeal that have considered the issue have held that *Stone* "survive[d] the passage of AEDPA."  *Newman v. Wengler*, 790 F.3d 876, 879 (9th Cir. 2015) (per curiam); *see also Hampton v. Wyant*, 296 F.3d 560, 562-63 (7th Cir. 2002) ("The AEDPA's changes to § 2254(d) apply only to cases within the scope of § 2254(a), which was not amended in 1996, and *Stone* is based on an interpretation of § 2254(a) that treats inaccurate administration of the exclusionary rule as outside the scope of that statute.").

Thus, post-AEDPA, *Stone* precludes federal habeas relief regardless of whether the Fourth Amendment claim was actually adjudicated on merits in state court and regardless of whether the state court's adjudication was contrary to or an unreasonable application of clearly established Supreme Court law, or was an unreasonable determination of facts in light of the evidence presented in state court.  *See Newman*, 790 F.3d at 881.

Even if he could avoid the *Stone* bar, Jiles cannot demonstrate that he is entitled to habeas relief based on *Carpenter*.  "[C]learly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), includes only that court's decisions as of the time of the relevant state-court adjudication on the merits.  *See Greene*, 565 U.S. at 38-40.  A later affirmance of an "adjudication on the merits" on procedural grounds, or a decision by a higher court not to hear an appeal, are not

decisions resulting from the merits adjudication for purposes of 28 U.S.C. § 2254(d)(1). *Id.* at 39-40.

The last adjudication on the merits is the Appellate Division's affirmance, not the New York Court of Appeals' denial of leave, i.e., the decision not to hear the appeal.  *See Greene*, 565 U.S. at 39-40 (rejecting, as "an implausible reading of § 2254(d)(1)," that "the relevant 'decision' to which the 'clearly established Federal law' criterion must be applied is the decision of the state supreme court that disposes of a direct appeal from a defendant's conviction or sentence, even when (as here) that decision does not adjudicate the relevant claim on the merits").

At the time of the Appellate Division's affirmance of the conviction on December 22, 2017, *Carpenter* had not been decided.  Thus, it could not have been "clearly established Federal law" for purposes of 28 U.S.C. § 2254(d)(1).  *See Greene*, 565 U.S. at 38 (stating that "§ 2254(d)(1) requires federal courts to focu[s] on what a state court knew and did, and to measure state-court decisions against this Court's precedents as of the time the state court renders its decision" (alteration in original; internal quotation marks omitted)).

Moreover, *Carpenter*'s holding regarding CSLI and the Fourth Amendment had not been "clearly established" by any other Supreme Court decision in existence at the time of the Appellate Division's affirmance.  Indeed, "[p]rior to *Carpenter*, all six courts of appeal to have considered the question had held that the government acquisition of electronic data from third parties was not subject to the Fourth Amendment warrant requirement."  *United States v. Chambers*, 751 F. App'x 44, 46 n.1 (2d Cir. 2018) (summary order).

Accordingly, even if the *Stone* doctrine did not bar his Fourth Amendment claim, Jiles cannot show that the Appellate Division unreasonably applied, or ruled in a manner contrary to, clearly established Supreme Court precedent as of the time the Appellate Division rendered its decision.  *See*, *e.g.*, *Mackey v. Hanson*, No. 19-CV-01062-PAB, 2019 WL 5894306, at *6 (D. Colo. Nov. 12, 2019) (*Carpenter* was decided while the petitioner's petition for writ of *certiorari* to the Colorado Supreme Court on direct appeal was pending and the petitioner filed supplemental authority asking that court to consider *Carpenter*; under *Greene*, *Carpenter* was not clearly established federal at the relevant time and therefore "the fact that the Colorado Court of Appeals did not consider *Carpenter* does not demonstrate a failure to make colorable application of the correct Fourth Amendment standards").  The Fourth Amendment claim therefore does not provide a basis for habeas relief.

## II.    *Batson* Violations

### A.    The Trial Court's *Batson* Rulings

#### 1.    Ms. Stines (Prospective Juror 7)

Jiles's first *Batson* challenge concerned a black female prospective juror, Ms. Stines, designated as prospective juror 7.  The prosecutor did not question Ms. Stines. Trial counsel engaged her in a colloquy regarding her graduate studies:

> [TRIAL COUNSEL]: Ms. Stines, you are actually pursuing your dissertation at this point, right?
>
> PROSPECTIVE JUROR 7: Yes.
>
> [TRIAL COUNSEL]: That is in psychology?
>
> PROSPECTIVE JUROR 7: Yes.
>
> [TRIAL COUNSEL]: Do you have a specific subject or area you are working on?

14

PROSPECTIVE JUROR 7: General Psych.

[TRIAL COUNSEL]: Does your dissertation have a subject matter or area you are studying or researching?

PROSPECTIVE JUROR 7: I am doing a theory on planned behavior regarding African Americans and donated blood.

[TRIAL COUNSEL]: If you get picked for this jury , is that going to interfere with the work you are doing?

PROSPECTIVE JUROR 7: No.  My dissertation goes at my pace, sir [sic].

[TRIAL COUNSEL]: So you are comfortable if you get picked you can concentrate on the evidence here and stay on the case?

PROSPECTIVE JUROR 7: Yes, ma'am .

TT: 333.

The prosecutor used a peremptory strike against Ms. Stines.  TT:  351.  Trial counsel raised a *Batson* challenge, arguing that (1) the prosecution did not question Ms. Stines at all; and (2) Ms. Stines stated that her work on her dissertation "would not affect her ability to sit in this case" because it "was a self-study [program]."  TT: 351-52.

The trial court asked if the prosecution wished to be heard.  TT: 352.  The prosecutor replied that a response was unnecessary because she had already selected two or three black jurors, and the defense had not shown the requisite pattern of discrimination.  TT: 352.  The trial court replied that it was "up to [her]" if she wanted to place her race-neutral reasons on the record; the prosecutor reiterated that she did not think it necessary but would do so if required.  TT: 352.  The trial court then asked her to respond to the *Batson* challenge.  The prosecutor stated,

Judge, initially she does have a background where she is currently studying psychology, working on a Ph.D. for psychology, also was a plaintiff in a

litigation, slip and fall.  For those reasons I don't feel, in my opinion, she would be the best juror for this case, and that is why I chose to strike her.

TT: 352-53.  Trial counsel responded that there "are several individuals who indicated that they are students or been a student, so I don't think that that is an extraordinary factor."  TT: 353.  The trial court stated, "I don't feel that the issue rises to the level of *Batson* so the application is denied."  TT: 353.

### 2.    Ms. Horton (Prospective Juror 13)

The second *Batson* challenge involved another female black juror, Ms. Horton, designated as prospective juror 13.  Ms. Horton was involved in a colloquy with the prosecutor and prospective juror number 21, Mr. House, a male individual whose race is not specified in the record.  In the following colloquy, the prosecutor used a sports analogy to gauge the prospective jurors' beliefs regarding accomplice liability and liability under the felony murder statute:

> [THE PROSECUTOR]: Now, kind of probably a new concept for many people but there are circumstances in real life where we can see this.  Kind of a simple example, but we see this kind of thing in team sports, don't we? We see this when somebody commits a penalty, don't we, something like football, Mr. House, I don't have a questionnaire, but I know a little bit about you, happens when somebody—one player commits a penalty, would it be fair to say everybody, the entire team gets penalized?
>
> PROSPECTIVE JUROR 21: Yes.
>
> [THE PROSECUTOR]: So, in fact, everybody is penalized.  So you think everybody on the team wanted the one player to commit the penalty?  It is something we see in everyday life, where we do pool people as a group, a team.  If everybody is working as a team, even if people commit a penalty, we hold everybody accountable.  What do you think about that?
>
> PROSPECTIVE JUROR 21: Different degrees.
>
> THE COURT : Ms. Horton?
>
> PROSPECTIVE JUROR 13: I agree with her [sic].

[THE PROSECUTOR]: Different degrees?

PROSPECTIVE JUROR 13: Yes.

MR. BEZER: What if the Court tells you we hold everybody to the same degree?

That is fair.[7]  Apply the law, set aside your feelings.  Get to a point we feel we can't and that is okay as well.

TT: 323-24.

The prosecutor later exercised a peremptory strike against Ms. Horton.  TT: 354.

Trial counsel raised a *Batson* challenge, asserting that:

[T]here is a pattern here of discrimination using peremptory challenges by the Government on people's color.  Now we have Ms. Stines, 7 juror number 7, which was just relieved by the People, 8 now we have Ms. Horton, she is juror number 13, a female black individual, and she indicated that she could be a fair juror, indicating no bias in this case, Judge.

TT: 354-55.  When asked to respond by the trial court, the prosecutor reiterated that she had "select[ed] three jurors of color" and "add[ed] the reasons for striking Ms. Horton have to do with her answers to [the other prosecutor]'s questions with regard to accomplice liability and felony murder."  TT: 355.  The trial court did not ask the defense to respond, and trial counsel did not request to be heard further.  The trial court then found that "a *Batson* challenge has [not] been sustained."  TT: 355.

C.    **Appeal of the *Batson* Claims**

On direct appeal, Jiles argued that "the trial court failed to engage in a meaningful examination in the critical third step [of *Batson*] and erroneously accepted the

---

[7] Given the prosecutor's response, "That is fair," the Court surmises that the prospective jurors provided nonverbal answers to his question about "hold[ing] everybody to the same degree."

prosecution's specious and flimsy justifications" for peremptorily striking Ms. Stines and Ms. Horton and "finding that the strikes were not based on race."  SR: 028.  According to Jiles, the reasons offered by the prosecutor—that Ms. Stines was a psychology student and had been a plaintiff in a slip-and-fall lawsuit and that Ms. Horton gave a problematic answer concerning accomplice liability—"were so obviously pretextual that the only reasonable conclusion could be that they masked purposeful race-based discrimination." SR: 032.

Jiles also asserted two new rationales for finding pretext that were not articulated by trial counsel at the time of the challenges.  The first related to Ms. Stines's psychology studies and experience role as a slip-and-fall plaintiff.  Jiles argued that the reasons were pretextual because psychology and civil litigation were irrelevant to any issues in his criminal case and that if the prosecutor truly had concerns about Ms. Stines's fitness to serve as a juror, the prosecutor would have asked her about those topics.  SR: 032.  Jiles noted that the prosecutor did not ask Ms. Stines any questions at all, thereby demonstrating that both proffered reasons were merely an "afterthought" to mask racial discrimination.  *See* SR: 032-034.

Jiles asserted a second new pretext argument—that Ms. Horton was treated differently from Mr. House, "who is Caucasian."  SR: 039; *see also* SR: 016 (asserting Mr. House "is Caucasian").[8]  Jiles argued that since the prosecutor did not strike Mr. House

_____

[8] Appellate counsel did not cite to the jury selection transcript as support for the contention about Mr. House's race.  The only citations in this section of the brief are pages "A145" and "A146" of the direct appeal appendix, which are pages 354-55 of the trial transcript.  Those pages, however, are the colloquy regarding *Batson* challenge of Ms. Horton.  *See* TT: 354-55.  Respondent points out that because trial counsel did not make a disparate treatment argument after the trial court denied the *Batson* challenge, there was no reason to place Mr. House's racial background on the record.  ECF No. 25 at 20 n.20.

for giving the "exact same answer" as Ms. Horton, it showed discriminatory intent in the peremptory strike of Ms. Horton.  SR: 041-042.

The Appellate Division rejected the prosecution's argument that Jiles had not made out a *prima facie* case at step one.  *See Jiles*, 158 A.D.3d at 78.  The Appellate Division explained that since "the prosecutor offered race-neutral reasons for the challenges and the [trial] court thereafter 'ruled on the ultimate issue' by determining, albeit implicitly, that those reasons were not pretextual, the issue of defendant's *prima facie* showing of discrimination at step one of the *Batson* analysis is moot."  *Id.* (quoting *People v. Smocum*, 99 N.Y.2d 418, 423 (2003)).

As to the merits of the pretext arguments asserted before the trial court, the Appellate Division determined that the trial court "did not abuse its discretion in crediting, as nonpretextual, reasons offered by the prosecutor for each of the challenges, i.e., [Ms. Stines]'s status as a psychology student, and [Ms. Horton]'s accomplice-liability-related answer that the People considered unfavorable to their theory of the case."  *Id.*

The Appellate Division found that Jiles failed to preserve for review the "specific contention" that Ms. Stines's "status as a psychology student was a pretext for discrimination because it did not relate to the facts of the case."  *Id.* at 79.  The Appellate Division held that, in any event, the unpreserved contention involving Ms. Stines was "without merit" because "the lack of a relationship between a race-neutral reason for a peremptory challenge and the facts of a case does not automatically establish that the reason is pretextual."  *Id.*  The Appellate Division further found that "the record [did] not establish that the prosecutor engaged in disparate treatment of other panelists similarly

situated to [Ms. Stines]." *Id.*  The Appellate Division did not mention Jiles's pretext argument based on Ms. Stines's prior experience as a slip-and-fall plaintiff.

With regard to "the allegedly disparate treatment of [Ms. Horton] and a panelist later seated as an alternate juror, [Mr. House]," the Appellate Division rejected that claim as "unpreserved" because Jiles "did not renew his *Batson* application after the prosecutor failed to challenge [Mr. House]." *Id.* at 79.  The Appellate Division declined to review the disparate treatment claim involving Mr. House and Ms. Horton as a matter of discretion in the interest of justice.  *Id.* (citing N.Y. Crim. Proc. Law § 470.15(6)(a)).

### D.   Procedural Default

"Under the independent and adequate state ground doctrine, a federal court sitting in habeas 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'"  *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (emphases in original) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

Respondent argues that the new pretext arguments asserted on direct appeal are procedurally defaulted because the Appellate Division relied on adequate and independent state grounds to find them unpreserved.  ECF No. 13 at 22.  In his reply, ECF No. 14, Jiles did not acknowledge Respondent's procedural default argument or respond to it.

The Supreme Court has observed that it is appropriate to bypass procedural questions to reach the merits of a habeas petition "if the [underlying issues] are easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law."  *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997).  Here,

Respondent's assertion of procedural default requires the Court to assess the adequacy and independence of two different state procedural rules, whereas the *Batson* claim may be denied relatively easily.  Therefore, the Court elects to bypass the procedural issues raised by Respondent's assertion of procedural default.

###### E.     Merits

In *Batson*, the Supreme Court established a three-part burden-shifting analysis for determining whether a prosecutor has impermissibly excluded jurors based on race:

> First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358-59 (1991) (internal citations omitted). Throughout the *Batson* three-step process, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the [peremptory] strike."  *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *see also Johnson v. California*, 545 U.S. 162, 170-71 (2005) ("*Batson* explicitly stated that the defendant ultimately carries the burden of persuasion to prove the existence of purposeful discrimination.") (internal quotation marks omitted).

"[W]hen it is unclear whether AEDPA deference applies," the Supreme Court has stated that courts may "deny writs of habeas corpus under § 2254 by engaging in *de novo* review because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review."  *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).  That is the approach the Court follows in reviewing the petition's *Batson* arguments.

### 1. Ms. Stines

### a. Status as a Psychology Student

Jiles first argues that because Ms. Stines's area of study—psychology—was not relevant to the subject matter of Jiles's trial, it was an obviously discriminatory and pretextual reason for striking her.  Jiles cites no precedent for the proposition that a reason for a peremptory strike must be connected to the subject matter of the *Batson* challenger's trial in order to be found non-pretextual at step three.   Courts have found that a prospective juror's background in psychology is a race-neutral reason for exercising a peremptory strike, even where it was not necessarily related to the subject matter of the trial.  *See*, *e.g.*, *Mahaffey v. Ramos*, 588 F.3d 1142, 1147 (7th Cir. 2009); *Jackson v. Knowles*, No. CV 06-6929-MMM, 2009 WL 6635300, at *11 (C.D. Cal. Nov. 23, 2009), *report and recommendation adopted*, No. CV 06-06929-MMM, 2010 WL 2652240 (C.D. Cal. June 30, 2010).

Jiles also asserts that "several other students, who were white, were not stricken." ECF No. 2 at 21 (referring to TT: 353).  Jiles does not identify these jurors, however, and the jury selection transcript does not reflect any statements by other prospective jurors that they were or had been students.  Notably, after the prosecutor gave her race-neutral reasons for striking Ms. Stines, defense counsel did not follow up by identifying any of the jurors who were or had been students.  TT: 353.  Thus, to the extent that Jiles claims that there were "white students" who were not stricken, he does not accurately quote the record.  Jiles has not established that Ms. Stines was subjected to disparate treatment based on her status as a psychology student and has not carried his burden of persuading the Court that the prosecutor engaged in purposeful discrimination in excusing Ms. Stines.

Jiles next contends that Ms. Stines's status as a psychology student was pretextual because she did not express any concerns that her studies would interfere with her responsibilities as a juror.  ECF No. 2 at 25 (citing *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008)).  In *Snyder*, the prosecutor attempted to justify a peremptory strike against a black undergraduate college student because he had expressed concerns about the trial interfering with his student teaching obligations.  552 U.S. at 478.  The prosecutor argued that the student might hesitate to convict on a death-penalty-eligible count so that he could avoid the penalty phase and "go home quickly" to attend to his teaching duties.  *Id.*

However, this reason was contradicted by the record.  More specifically, the trial judge had reached out to the college dean and received assurances that the dean would "work with" the student so he could complete his teaching obligations.  *Id.* at 482.  Once the trial judge informed the student about this conversation with the dean, the student expressed no further concern about serving on the jury.  *Id.*  Thus, in *Snyder*, an inference of pretext arose because the prosecutor's purported race-neutral reason relied on a mischaracterization of the record.  *Id.* at 479.  Unlike the prosecutor in *Snyder*, the prosecutor here did not mischaracterize Ms. Stines's statements or any part of the record.  Thus, *Snyder* is distinguishable and does not assist Jiles in carrying his burden of persuading the Court that the prosecutor engaged in purposeful discrimination.

Jiles also argues that the prosecutor's failure to ask follow-up questions about Ms. Stines's graduate studies in psychology shows that the proffered reason merely was an attempt to hide purposeful discrimination.  ECF No. 2 at 22 (citing *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005)).  The passage in *Miller-El* to which Jiles cites involved a male black prospective juror who the prosecutor struck based on his purported hesitancy to impose

the death penalty.  According to the prosecutor in *Miller-El*, the prospective juror had said he would only impose the death penalty if he thought a person could not be rehabilitated, and anyone could be rehabilitated if they found God.  545 U.S. at 243.

The prospective juror "unequivocally" had stated, however, that "he could impose the death penalty regardless of the possibility of rehabilitation."  *Id.* at 244; *see also id.* at 242 (the juror stated, e.g., that "the State acts on God's behalf when it imposes the death penalty").  The Supreme Court allowed that the prosecutor "[p]erhaps . . . misunderstood, but unless he had an "ulterior reason for keeping [that juror] off the jury[,] . . . he would have proceeded differently."  *Id.*  Particularly in light of the juror's "outspoken support for the death penalty, [the Supreme Court] expect[ed] the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike."  *Id.*  The fact that the prosecutor did not do so showed that he "simply mischaracterized" the prospective juror's responses for purposes of justifying the peremptory strike.  *Id.* at 244.

In contrast to *Miller-El*, the record here does not reflect that the prosecutor misstated Ms. Stines's responses about an issue that was important to the prosecution's trial strategy or the case against Jiles generally.  Jiles has not established any facts supporting a finding that the prosecutor's failure to ask follow-up questions about Ms. Stines's graduate studies was a pretext.  Therefore, he has not carried his burden of persuading the Court that the prosecutor engaged in purposeful discrimination.

### b.    Experience as a Slip-and-Fall Plaintiff

Relying again on *Miller-El*, Jiles claims that since the prosecutor did not ask Ms. Stines any questions about her experience as a slip-and-fall plaintiff, it was an

"afterthought" meant to cover up racial discrimination.   In *Miller-El*, After defense counsel called out the prosecutor's misrepresentation of the prospective juror's responses regarding the death penalty, the prosecutor neither defended his statement nor withdrew the strike.  545 U.S. at 245.  Instead, the prosecutor "suddenly" offered another reason for the strike—that the prospective juror's brother had a prior conviction—which "reek[ed] of afterthought."   *Id.* at 246.   According to the Supreme Court, the new reason's implausibility also was shown by the prosecutor's failure to ask the prospective juror anything further about the influence his brother's criminal history might have had on him, which the prosecutor "probably would have done if the family history had actually mattered." *Id.*

Unlike in *Miller-El*, the prosecutor cited Ms. Stines's prior litigation experience immediately after she offered Ms. Stines's psychology studies as a reason for striking her and before the trial court expressed any opinion about either of the proffered reasons.  It bears noting that trial counsel did not offer any rebuttal to the prosecutor's reliance on Ms. Stines's experience as a slip-and-fall plaintiff.  *Miller-El* is distinguishable and does not assist Jiles in carrying his burden of persuading the Court that the prosecutor engaged in purposeful discrimination.  Jiles has not established any facts supporting a finding that the prosecutor's failure to ask follow-up questions about Ms. Stines's experience as a slip-and-fall plaintiff was a pretext, and he therefore has not carried his burden of persuading the Court that the prosecutor engaged in purposeful discrimination.

### 2.   Ms. Horton

Jiles claims that the prosecutor's reason for striking Ms. Horton—that she gave a problematic answer concerning accomplice liability and felony murder—was obviously

pretextual.   Jiles also argues that Ms. Horton was treated differently than a similarly situated white juror, Mr. House.   "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."   *Miller–El v. Dretke*, 545 U.S. at 241; *see also United States v. Odeneal*, 517 F.3d 406, 420 (6th Cir. 2008) (finding *Batson* violation where prosecutor said he excluded a black prospective juror because she had been on a jury that acquitted but did not exclude a white person who served on same jury; when asked about the discrepancy, the prosecutor could provide no explanation).

The jury selection transcript does not indicate Mr. House's racial identity, but  Jiles continues to assert that Mr. House is white.   *See*, *e.g.*, ECF No. 2 at 20 (citing pages "A145" and "A146" of the direct appeal appendix).   Pages A145 and A146 are copies of pages 354-55 of the trial transcript and merely reflect the colloquy regarding the *Batson* challenge as to Ms. Horton.   The colloquy does not contain any mention of Mr. House's race.   *See* TT: 354-55.

Despite being alerted to this issue by Respondent's opposition memorandum of law, Jiles's reply continues to cite to pages "A145" and "A146" for the proposition that Mr. House is white.   *See* ECF No. 14 at 11; *see also id.* at 14 ("The only difference between the two was that Mr. House was white and Ms. Horton was black.").   The Court has reviewed the jury selection transcript in its entirety, and Mr. House's race is not mentioned anywhere.

Even assuming that Jiles is correct that Mr. House is white, the record belies his assertion that there were *no* differences between him and Ms. Horton except their

respective races.   The transcript shows that Mr. House knew one of the courtroom deputies, "Andy," and stated that Andy was "the only one" he let onto his property to hunt. TT: 347.[9]  There was nothing to indicate that Ms. Horton was similarly situated to Mr. House in this way.

Moreover, Ms. Horton was not the only prospective juror struck on the basis of their responses to the prosecutor's accomplice liability and felony murder hypotheticals. In fact, the prosecutor previously had exercised a for-cause challenge to prospective juror number 12, Mr. Lattanzio, based on his responses to the prosecution's line of questioning on accomplice liability and felony murder using the football analogy.   The prosecutor explained that Mr. Lattanzio "didn't agree with them" and "was equivocal in his answers." TT: 162.   The defense sought to keep Mr. Lattanzio on the jury.   *Id.*   Though it was a "close call," the trial court rejected the for-cause challenge.   *Id.*   The prosecutor later exercised a peremptory strike to remove Mr. Lattanzio.  TT: 163.  Three additional jurors— Mr. Doan, Mr. Nash, and Mr. Cognata—gave equivocal or unfavorable answers to the other prosecutor's line of questioning about accomplice liability and felony murder, *see* TT: 125-29.  The prosecutor peremptorily struck all three.  TT: 163-65.

In sum, Jiles's disparate treatment argument is based on allegations that are not substantiated by the jury selection transcript.   Jiles has not established any facts supporting a finding that the Ms. Horton was treated differently than Mr. House because of her race and therefore has not carried his burden of persuading the Court that the prosecutor engaged in purposeful discrimination in excusing Ms. Horton.

### 3.      The Discriminatory Pattern Argument

---

[9] Ultimately, Mr. House was seated as the second alternate juror.  T: 359.

Jiles asserts that "the trial court erred in requiring a 'pattern' of discrimination as a prerequisite for finding a *Batson* violation."  ECF No. 2 at 20-21.  Respondent argues that Jiles did not raise this argument on direct appeal and therefore it is unexhausted.  ECF No. 13 at 26 n.21.  Jiles's reply does not address Respondent's assertion of the non-exhaustion defense.

The Court need not resolve the exhaustion issue because the argument is plainly without merit.  *See Boddie v. New York State Div. of Parole*, 285 F. Supp.2d 421, 428 (S.D.N.Y. 2003) (finding that "thorny issue" of exhaustion in the context of habeas challenge to parole decision "need not be addressed" since underlying claims were clearly without merit; 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of an applicant to exhaust the remedies available in the Courts of the state.").

The jury selection transcript as well as the Appellate Division's opinion demonstrate that the trial court did *not* require Jiles to establish a pattern of discrimination at step one before moving to step two and requiring the prosecutor to provide race-neutral reasons.  Accordingly, this claim is factually baseless and does not warrant habeas relief.

## III.    Ineffective Assistance of Trial Counsel

### A.    Background

Jiles reasserts the ineffective assistance of counsel claims raised in the C.P.L. § 440.10 motion, which the 440 court denied as procedurally barred pursuant to C.P.L. § 440.10(2)(c) and, in the alternative, as without merit.  SR: 866-67.  Respondent asserts that C.P.L. § 440.10(2)(c) was an adequate and independent state ground on which to dismiss the ineffectiveness claims, *see* ECF No. 13 at 40-42, and that those claims are

procedurally defaulted because Jiles cannot show cause and prejudice, or a fundamental miscarriage of justice, *see id.* at 42-43. Jiles has not addressed the procedural default argument.

The ineffective assistance allegations are clearly meritless, while Respondent's assertion of procedural default presents a potentially complicated issue of state law. The Court therefore will proceed directly to the substance of the ineffective assistance claims. *See*, *e.g.*, *Anderson v. Graham*, No. 6:15-cv-06687-MAT, 2018 WL 1428249, at *2 (W.D.N.Y. Mar. 22, 2018) (declining to "resolve the issues raised by [the r]espondent's assertion of the defenses of non-exhaustion and procedural default" and proceeding to decide the claims on the merits (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).

**B.      Merits**

**1.      Legal Standard**

To succeed on a claim of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), the petitioner must establish that counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, and prejudiced the defense, *see id.* at 694. Prejudice, for *Strickland* purposes, is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "The habeas petitioner bears the burden of establishing both deficient performance and prejudice." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005). A petitioner's failure to demonstrate prejudice obviates the need to consider whether trial counsel's performance was deficient. *See Strickland*, 466 U.S. at 697 (stating that where the court can "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," it need not address the performance prong).

## 2.    Failure to Object to a *Brady* Violation

Jiles claims that trial counsel should have objected to the prosecution's alleged failure to comply with *Brady* by preserving and disclosing records from Vasquez's cell phone which allegedly contained exculpatory and impeachment evidence.   This ineffectiveness claim and the underlying *Brady* claim were raised in the C.P.L. § 440.10 motion.

The 440 court ruled that Jiles did not allege any of the three elements of a *Brady* violation—that the evidence was favorable, that it was suppressed, and that the defense was prejudiced because the suppressed evidence was material.   SR: 865; *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (stating that the "three components of a true *Brady* violation" are that "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued").   The 440 court found "no support for the contention that the prosecutor or police were responsible for suppressing the phone records."   *Id.*   To the contrary, Jiles asserted that "Vasquez destroyed his own phone records."   *Id.*

The 440 court further found that Jiles failed to show the alleged contents of the cell phone records were suppressed because Vasquez's drug-dealing was "not exactly a secret."   *Id.*   The 440 court observed that trial counsel referenced Vasquez's drug-dealing in his opening argument, and Vasquez admitted on cross-examination that he sold marijuana and cocaine out of the 24 Peckham Street apartment.   SR: 865.   The 440 court explained that "[e]ven if the phone records contained the impeachment material the defendant believes they did (defendant has no way of knowing that), it cannot be said, in

light of all the proof, that the records were material."  SR: 866 (alteration in original).  The 440 court agreed with the Appellate Division's assessment that the evidence of his "identity as a participant in the crime [was] overwhelming."  *Id.* (quotation omitted).

With regard to the ineffectiveness claim based on the failure to object to the *Brady* violation*,* the 440 court found that "defense counsel did file a general *Brady* demand," and Vasquez's "drug-dealing activities were disclosed during trial testimony and used effectively during cross-examination."  SR: 867.  The 440 court reiterated that "[n]o *Brady* violation occurred, because the information, even if it existed, was not material."  *Id.*  The 440 court also found that Jiles failed to demonstrate that counsel did not have a legitimate strategic reason behind his handling of the alleged *Brady* issue.  *Id.*  Finally, the 440 court determined that "in viewing the trial as a whole, it cannot be said that defense counsel failed to provide meaningful representation."  *Id.* (quotation omitted).  The 440 court's rejection of the ineffective assistance claim based on trial counsel's handling of the alleged *Brady* violation reflects a correct application of federal law.

As an initial matter, Jiles has not shown that Vasquez's cell phone records were "suppressed" by the prosecution.  "The government's discovery and disclosure obligations extend only to information and documents in the government's possession." *United States v. Brennerman*, 818 F. App'x 25, 29–30 (2d Cir. 2020) (citing *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (explaining that the *Brady* obligation applies only to evidence "that is known to the prosecutor")).  At a pretrial appearance on June 22, 2012, during a colloquy about Vasquez's phone and other phones Jiles may have called, the prosecutor noted:

> With respect to, again, any allegation that the People are under some obligation to turn over who owns the phones that this defendant called on

> the date in question, I can't help but first just reiterate the defendant knows who he called on the date and time in question and, additionally, if the defendant wants any additional information regarding phone records, those items are not in the control and custody of the People.  Those are obtainable by the defendant by the use of subpoena.

6/22/22 Tr. at 16.  The trial court asked the defense, "Why do you need the People to tell you who the people are that he called if these are his phone records?"  *Id.* at 17.  Defense counsel responded:

> There are also incoming calls, Judge.  And the only thing we have right now is the notes on the side of a record indicating, you know, this is Mr. Vasquez's phone number.  We don't have anything that confirms that Mr. Vasquez, in fact, was using that phone.  So, that's just the government's interpretation of this record.  So, now we're in a position -- because we've been prevented up to this point, now we're in a position to pursue that particular phone number and those records.  Judge, if we had these in October, we could have done this.

*Id.* at 18.  Trial counsel thus admitted that the records could have been obtained via subpoena, and did not dispute the prosecutor's assertion that she did not have Vasquez's phone records.

Apart from noting that the subpoena process was time-consuming, trial counsel pointed to no legitimate reason why the defense team would not be able to obtain the records themselves.  Petitioner thus has not shown that Vasquez's cell phone records were in the prosecution's "possession" such that *Brady*'s disclosure requirement was triggered.  *See, e.g., United States v. Bendelstein*, No. 18-CR-00309 (HG), 2023 WL 2457842, at *6 (E.D.N.Y. Mar. 10, 2023) ("Since Defendant knew about his own phone call with Safeguard Services, Defendant could have submitted a subpoena requesting any records of that call or other relevant information in Safeguard Services' files." (citing *Brennerman*, 818 F. App'x at 29-30).

Furthermore, Petitioner has not shown that he was prejudiced by trial counsel's performance.   Prior to trial, defense counsel diligently sought information regarding ongoing criminal investigations into Vasquez.  *See* 6/21/12 Tr. at 14.  As a result, defense counsel learned that Vasquez's "sale and/or possession of cocaine on or about and between spring 2011 and June 2012."  6/22/12 Tr. at 4.  At trial, counsel cross-examined Vasquez extensively about his drug-dealing and related convictions.  (TT: 682-83, 685, 697-99, 710-13).  On summation, trial counsel repeatedly described 24 Peckham Street as a "drug house," where Vasquez and the other witnesses engaged in an "illegal" and "dangerous" business.   (TT: 1206-08, 1212-13, 1215, 1223).   Even assuming that Vasquez's phone records contained additional information about his drug-dealing, Jiles has not shown that it was non-cumulative of the information already in the defense's possession.  And given the overwhelming identity evidence linking Jiles to the crime, there is simply no reasonable probability of a different verdict even if trial counsel had obtained Vasquez's phone records.

Jiles also argues that he could have used the historical CSLI for Vasquez's phone to pinpoint where the phone was at the time of the homicide.  ECF No. 14 at 4 (citing SR: 875).   According to Jiles, the historical CSLI for Vasquez's phone "would [have] determine[d] that [he] did not call the witness Vasquez on the day in question, and minutes before the crime to gain entrance into the residence to commit this crime of murder/robbery."  *Id.* at 4-5 (alterations in original) (quoting SR: 875).  Elsewhere, however, Jiles states that because "the cell phone evidence was not obtained," he was denied a "significant opportunity to challenge" the historical CSLI in Vasquez's phone.  *Id.*

Jiles thus admits that he does not know whether the CSLI for Vasquez's phone would have been exculpatory, inculpatory, or neutral.

Because Jiles has not established the existence of the CSLI from Vasquez's phone, let alone what the CSLI would have shown, Jiles cannot show that it was "material," i.e., that it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  The underlying *Brady* claim regarding CSLI on Vasquez's phone is based on pure speculation and is meritless.  *See*, *e.g.*, *Pucci v. Smith*, No. 08-CV-6092, 2010 WL 2869480, at *9 (W.D.N.Y. July 20, 2010) ("Petitioner's allegation that these records existed and were intentionally destroyed amounts to nothing more than conjecture and speculation.  Mere speculation that exculpatory evidence exists is not enough, in the absence of proof, to merit habeas relief." (citing *Strickler*, 527 U.S. at 286 ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review.")).  Jiles's attorneys could not have performed deficiently or prejudiced the defense based on their handling of a meritless *Brady* issue.

### 3.    Failure to Object to Prosecutorial Misconduct

Jiles claims that defense counsel was ineffective for failing to object to the prosecutor's reference to him by his nickname, "Hot Rod," when the prosecutor was questioning witnesses and making closing statements.  As Respondent argues, there was a practical reason for the prosecutor to do so—one of the identifying witnesses, Smith, knew Jiles only by his nickname.  TT: 538 ("Q. When you say, Hot Rod, do you know that person by any other name? A. No.").   Vasquez, who also provided identification

testimony, also knew Jiles as Hot Rod and had difficulty remembering Jiles's given name when he spoke to the police after the shooting.  TT: 684.  *See Ortiz v. Rock*, No. 09-CV-679 (PKC), 2016 WL 6068808, at *5 n.9 (E.D.N.Y. Oct. 13, 2016) (noting there was "a practical reason" for the use of the petitioner's nickname, "Crazy," i.e., the witness "testified that he only knew [the] [p]etitioner by that nickname and never knew his real name").

Moreover, the prosecutor generally referred to Jiles by his given name during her summation.  On the handful of occasions she used his nickname, she linked it to the witness's testimony using that nickname. *See*, *e.g.*. TT: 1244 ("Who did the witnesses all tell you was the first person through the door?  Sharad Jiles, Hot Rod.").  The record thus establishes that prosecutor's use of Jiles's nickname was not "gratuitous," *United States v. Farmer*, 583 F.3d 131, 146 (2d Cir. 2009), or "uttered in a context that, in effect, invited the jurors to infer," *id.* at 146-47, that Jiles had a criminal proclivity or other negative traits.

Jiles argues that the nickname "Hot Rod" was prejudicial because it conjured up images of "fast cars and fast money, living a fast life, life in the fast lane."  ECF No. 2 at 31.  Such images, however, are not inherently evocative of a criminal or violent disposition.  *Cf.*, *e.g.*, *Ortiz*, 2016 WL 6068808, at *5 n.9 (finding that the nickname "Crazy" was "'not necessarily suggestive of a criminal disposition,' *United States v. Dean*, 59 F.3d 1479, 1492 (5th Cir. 1995), even though the nickname was conferred on [the] [p]etitioner when he joined MS-13 at the age of thirteen in El Salvador").

In sum, Jiles has not established that prosecutor's limited use of his nickname deprived him of a fundamentally fair trial, and thus trial counsel's failure to object was not objectively unreasonable and did not result in prejudice to the defense.  *See*, *e.g.*, *Diallo*

*v. United States*, No. 12 CIV. 3310, 2014 WL 4460364, at *9 (S.D.N.Y. Sept. 10, 2014) (finding that "[i]t was not unreasonable for [counsel] to refrain from objecting to the use of the alias because the alias'[s] admission was proper for identification purposes").

## CONCLUSION

For the foregoing reasons, the request for a writ of habeas corpus is denied, and the Petition, ECF No. 1, is dismissed. Because Jiles has failed to make a substantial showing of the denial of a constitutional right, *see* 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. The Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

HON. CHARLES J. SIRAGUSA
United States District Judge

Dated:      November 6, 2023
            Rochester, New York.